Our second case, 24-2143 McPherson v. Patton, Ms. Horne. Good morning, may it please the court. My name is Gail Horne and I'm here on behalf of the plaintiff appellants who are also present in court. This case is about the wrongful conviction of two innocent men. As the district court noted in its opinion, there is substantial evidence of their innocence in the record. They had multiple alibi witnesses who testified on their behalf and the state of Maryland has declared them innocent. One of the primary pieces of evidence that was used to convict my clients was the taped police statement of Marcus King. And just to put it into perspective, Marcus King at the time was a 13-year-old with very limited capacity. Contemporaneous evaluations of Marcus demonstrated that his IQ was in the low to mid-50s and that he had the reading comprehension of a first grader. He recanted on the stand, he testified under oath subject to cross-examination during trial which was contemporaneously recorded. So he was killed in 2000 and now you only have his statement of that time that you want to get in. And the trial court made a decision not to allow it in, but you think it should have been allowed in. That's correct, Your Honor. We think that it was an abuse of discretion for the court to refuse to permit that testimony to come in under Rule 804B1. That's a pretty high burden. I mean, you've got to show that the ruling was essentially irrationable, unreasonable, contrary to the law. And not just that the judge might have gotten it wrong or even if we might have ruled differently. I don't think that gets you there. So what is it about this ruling that meets that very high burden? Yes, Your Honor. There were three clear errors of fact on which the district court based its opinion. And a clear error of fact using that as a basis for a decision is an abuse of discretion. So she said there were three reasons why there was no similar motive. The first was that the prosecutor was shocked by the recantation of Marcus on the stand and that she didn't have time to prepare her cross-examination. That is directly contradicted by the record. Marcus recanted in November just a couple of months after he gave his statement to evaluators who were evaluating him in connection with his juvenile proceedings. He recanted again to a state's attorney investigator and the prosecutor disclosed that in an amended disclosure. He even recanted on the way to trial. Detective Patton picked him up to take him to court the first day of trial. And he told Detective Patton according to Detective Patton's own testimony that what he said on the tape was a lie. And that he was that Mr. McPherson and Mr. Simmons had nothing to do with the crime. Ms. Holback, the prosecutor in this case, gave a deposition. In her deposition she said, I wasn't surprised by the recantation. I knew about the prior recantations and witnesses flip-flop all the time. What I was shocked by was his calm and cool demeanor in making this recantation. So it was clear error for the district court to say, Holback, the prosecutor, was shocked by this recantation and could not prepare. That's not supported, that's directly contradicted by the record. Okay, but that error has to have had an impact on the ultimate decision. So how did it impact the decision? Well, she said these were the three, so that was one of her three bases. She had two other bases. Her second basis was, it was a reasonable strategy. Once the court sua sponte said, hey, you can get in Marcus's police statement. It was reasonable for her to cut her losses and get Marcus off the stand. In theory, maybe that would be a reasonable strategy. That was not the strategy of the prosecutor in this case. In this case, she nearly doubled her cross-examination. She went into all kinds of topics, not just clarifying what he had previously said, but attacking the recantation. Who made you say what when? Who exactly was the person who told you to say this? Didn't you have your Miranda rights given to you? Wasn't your mother present? So regardless of whether it would be a reasonable strategy, it was not the prosecutor's strategy in this case. So that's the second basis that she used. It's also directly contradicted by the record. The last basis that she said made it so that there was no similar motive was that the prosecutor did not have any need to either defend defendant Patton's credibility or the integrity of the investigation. That's also not borne out by the record. The record directly contradicts that. She asked questions of Marcus, the ones I just mentioned, about was he given his Miranda rights? Was his mom there? She asked questions of Detective Patton to try to explain the coercion. He said, oh, I only put on handcuffs and leg irons for Marcus's safety. I only yelled at him because I wanted him to understand it was important. It was a serious situation. And most importantly, she said, is it what he told you new? As in information you didn't provide to him, he provided to you. And he said, yes, some of it was new. And if there were any doubt that what she was after was to defend Patton and defend the integrity of the investigation, her closing sealed the deal. In her closing, she said Marcus gave his police statement not because he was given a script by the police, but because defendant Patton got through to him in that moment. She applauded defendant Patton for his integrity, for his intelligence, for his professionalism, and for his investigation that led to the wrongful conviction of my client. So that's the third basis that the judge used. And it's also clear error. So when you pick it apart and you look at the reasons why she used it, I appreciate abusive discretion is a high standard. But we've met it here because each of the bases that she used was a clear error. It was directly contradicted by the record. So you've got to apply then what facts might be competent in this case to the question of whether or not she had a substantially similar motive to rehabilitate the detective. Is that right in this case with respect to fabrication? Well, that was her claim was that in fact the prosecutor did not have a similar motive to rehabilitate the detective. But there's ample evidence in the record that that's exactly what she was doing. Think about it. This is one of her star witnesses. He's getting on the sand saying the police made me lie out of my mouth. I kept telling them. But the district court, as I understood it, and you can correct me if I'm wrong, concluded that really the prosecutor's principal motive here was to rehabilitate the witness, not necessarily the detective. What do you find incorrect about that? Because I don't think she had a motive to rehabilitate the witness, but she also had a motive to rehabilitate the detective and defend the integrity of the police investigation. And that included eliciting testimony from Marcus that he received his Miranda warnings, that his mother was present, that he wasn't mistreated by Patton when he picked him up and took him to court. It also included eliciting testimony from Patton about receiving his Miranda warnings, that he was only handcuffed for his safety, that his mother understood the charges, and that he yelled to just convey the gravity of the situation. And I pulled a quote from the closing argument where this all kind of comes together and you can really see what her trial strategy was. She says, not only am I not going to apologize for Detective Patton's banging on the table, but I applaud him, ladies and gentlemen. And she goes on later to say, he's a diligent, intelligent, professional, dedicated human being who wanted to solve this murder, and solve it he did. And she goes on, and she says, I applaud him for that. She says, Marcus confessed, quote, not because he was tortured, not because he was beaten over the head with a phone book like they did in other places, but because he decided that what he had done was terribly wrong, and Detective Patton got through to him for that moment in time. So you can see from the evidence... What about the trial court's admonition that the courtroom, that trial, was not the place to criticize or analyze the detective's conduct in this case? Is that somehow relevant to this issue? Well, I mean, unfortunately or fortunately, that was what was on trial in part, because what Marcus said to the jury was not only is this a lie, but the police made me say it. The police were yelling at me. The police were hollering at me. And in fact, Detective Patton said that he did all of those things. He said, I banged on the table. I stood on the desk. I yelled at him. I told him, we're not leaving here until you tell me the truth. And by the way, when the defendants said, oh, that means he couldn't have been coercing him, he couldn't have been fabricating him, what he meant and what Detective Patton testified at the criminal trial was the truth was what Diane Bailey told him, not some abstract concept of what might have actually happened. So in the face of two motivations, and is the test that they have to be, that they essentially have to be the same, equal, some one motive more than the other? How do we look at that? I think that Supermarket of Marlington answers that question. You look at the motives to see if they were similar. And even in Supermarket of Marlington, the motives were not identical. In the criminal case, the court said the motive was to prove that there was no conspiracy. In the civil case, the court admitted there were two motives. It was not just to prove that there was no conspiracy. It was also to prove that if there were a conspiracy, there was no element of fraudulent concealment involved in that conspiracy so that the statute of limitations would run on the claim. And that, I would say, is analogous to the situation. There's always going to be multiple motives. This is a complex murder case. The prosecutor doesn't have a singular interest as she's litigating and prosecuting the case. Her interest is, of course, to get Marcus' police statement in, to make sure that the jury appreciates or she tried to defend the veracity of that statement. But it's also she has to rehabilitate Detective Patton. She has to defend the investigation because otherwise she's left him out to dry. And this Marcus Marcus, that's one of her key witnesses. That's the only way they can corroborate Diane Bailey. Can I ask you another question about the fabrication claim? So there's two elements to that. First is you have to prove that the investigator fabricated evidence. And second, that that fabrication resulted in a deprivation of the plaintiff's liberty. And obviously the district court never reached that second element. So if we agree with you on the first prong of that test, what do we do about the second prong? The deprivation of his liberty? Yes. I would submit, Your Honor, that Marcus' false test, attempted to introduce through Marcus and ultimately introduced through Detective Patton, did in fact deprive my clients of their liberty. Do we get to decide that in the first instance or would you send it back to the district court? I think that's a jury question, frankly. I think there's sufficient evidence in the record to say that when you introduce false evidence, fabricated evidence from a detective, well, first of all, that can never be harmless. But regardless, there's sufficient evidence in this record to say that that causation question So we send it back for trial is what you're saying? Yes, Your Honor. Yes, Your Honor. I believe that the fabrication claim, there is sufficient evidence. A lot of what the district court did in this particular case was take the facts. Well, first of all, the district court didn't consider Marcus' trial testimony. And that obviously alone warrants a trial in this case. But even once that's considered, or even when you look at the other aspects, what the district court did and what the defendants want you to do in this case is take all the facts and all the inferences from those facts in their favor. They want you to weigh the evidence. But here this is a classic case of a dispute of fact that warrants a trial on the fabrication claim. So regardless of whether we agree with you on the issue of the proper application of the hearsay rule, it's your contention that we should still reverse summary judgment on the fabrication claim? Yes, Your Honor. I think that there is sufficient evidence in the record. Obviously, it's a much stronger claim if we can have Marcus' testimony admitted at trial. And I think even if you don't agree under 804B1, 807 is also applicable in this particular instance. We cited some case law in our brief. How could that be? I mean, you just indicated earlier that Mr. King was all over the place. I mean, the most unreliable of witnesses, and yet 807B requires significant evidence of trustworthiness of the statement. Those are completely contradictory. Well, the requirement in 807 for trustworthiness is a surrogate for in-court examination. We've cited U.S. v. Shaw, which specifically says that. And in this case, the trustworthiness surrounds the circumstances under which he gave it. He gave it under oath in front of a jury. He was subject to extensive cross-examination. In fact, I think his entire exam was ultimately cross-examination because he recanted. So we only look at that particular instance? We don't look at the other circumstances? Well, you also look at the rule specifically instructs, and the district court failed to do this, the rule specifically instructs to look at the corroborating evidence. And there is substantial corroborating evidence for his recantation in this case. And it's not just going to the innocence of the plaintiffs. Obviously that exists. But it's also about what happened in that interrogation room. Detective Patton admits to a number of the things that he did that Marcus testified to. He admits to banging. He admits to yelling at him. He admits to feeding him information about the guns. The sole culpability of Marcus is that he went and allegedly got these guns and brought them back and handed them to the shooters. Detective Patton admits, yeah, I told him all that information. I gave him all that information. His mother is another piece of corroborating information about what happened in the interrogation room. She testified. She couldn't remember everything, obviously, 30 years later. But she does testify that it was so coercive, so oppressive, that she thought her son was being physically threatened. She thought her son was forced to lie. And she had to remove herself from the interrogation room. So I think if you look at the circumstances under which Marcus's testimony was given and you look at the corroborating evidence for the testimony itself, I think that it does satisfy Rule 807. And I think that one of the things to remember is although Marcus was a less than perfect 13-year-old witness, again, with some limited capacity, he was firm. He was firm that the people who told him that it was Eric and JR, Mr. Simmons and Mr. McPherson, was the policeman, the white detective. The policeman made me say this out of my mouth. Before you sit down, I want to ask you a question about your second claim regarding the suppression of evidence. And in particular, the contention that you may have forfeited the issue of materiality because you simply sort of wave at it in a footnote. Can you address that? Your Honor, I think you're referring to the bad faith. Yes, sorry. Yes, Your Honor. Bad faith. Did I say materiality? Sorry. It's a long warning. Not as long as usual, but go ahead. We did reference bad faith. It was not an issue that the district court reached or had to reach in its opinion. We did reference it in the footnote, and the defendants were able to respond to it. And the defendant's response to our argument was that this court in a footnote in Owens said that bad faith cannot be inferred from the value of the evidence that was withheld. That is not what that footnote says. That footnote actually says some circuits require bad faith, some circuits don't require bad faith. The Fourth Circuit is the circuit that requires bad faith. And the courts have been able to and have inferred bad faith from the value of the evidence. That is that the evidence was so material that no reasonable officer would not have disclosed it. It couldn't be an accident. It couldn't be negligence. And I would submit that the evidence in this case is of that ilk. Because we have two witnesses who completely refute what Diane Bailey says. They say there was one shooter, and one of the witnesses even says, I can identify who that shooter is. That information was not disclosed to the plaintiffs for them to be able to use in their case. And what the district court said was, well, it wouldn't really be material or favorable because each witness who was out there saw just a piece of the puzzle. I would submit that is taking the evidence in the light most favorable to the defendants. That was actually what Detective Patton testified to. That is literally his story. But if you look closely at what was withheld, and you take the procedural posture of summary judgment at its value, what you can infer is none of these witnesses, Sandra Jackson or James Martin, they don't see five people running up the street the way Diane Bailey described it, and they don't see five people running back down the street. They see one shooter at the corner of Federal and Washington, and Sandra Jackson says, I can identify that shooter. So the plaintiffs could have put on a completely different case. It's not a conspiracy. It's not a big group shooting. It's one person, and it's not them. All right. Thank you very much. Thank you. Mr. Redmond. May it please the Court. I'm Michael Redmond on behalf of Appellee's Detective Robert Patton and Detective Frank Barlow. First, I'd like to correct a couple of misrepresentations that counsel just made. First, as far as the corroboration issue, the mother of Mr. King, her actual testimony on J.A. 8544 was that she never saw the detective feed King Fax on 8545, that she never saw them lay hands on King or threaten to lay hands on him, and at 8552 that she does not know whether King's recorded statement was true or false, even today. Also, other corroboration information that is in the record includes Mr. McPherson's in-custody confession to a psychological evaluator where he expressly said that he didn't directly shoot him, but he was part of the conspiracy where he corroborated, his story corroborated, exactly what the recorded statement by King was and exactly what Ms. Bailey's testimony was, that one day the stick-up boy was spotted and I told my little man to go get the guns, and beyond directly saying exactly what the story was there, he also gave details about Mr. Wooten lying on the ground shaking as he was suffering from his gunshot wound. So the overall corroborating does not at all suggest trustworthiness of Mr. King's recantation. Well, let me ask you this. The defendants were declared innocent. Doesn't that mean the statement was false? No, your honor. That means that the state cannot make them guilty. That was a declaration of innocence is what I'm saying. A declaration of innocence is a factual declaration, I think. I don't think it's a legal thing. If you pardon or you get clemency, that's one thing, but to say you are, I take the word, is actually innocent on it, doesn't it by definition say there was something false in that trial? No, your honor. It does not, and that is not at all in any way binding on this civil trial where the defendants here were no party to those proceedings. They are not the state. They had no ability to intercede in those proceedings whatsoever. That is in no way binding here. We start from a blank slate. The plaintiffs are required to meet their burdens, which is exactly what they did not do here. We cannot get to the summary judgment stage. How do we view this evidence? We view it in light most favorable to the plaintiffs, but that is exactly what was done here by the district court. It's just that what the appellants claim would be the light most favorable, what are reasonable inferences, what they call reasonable inferences, are actually speculation. They try to argue that things that would actually be speculation that don't actually have a rational basis for eliminating other possibilities, that that is an inference available to a jury when it is not. Let me ask you this. They were convicted and spent how many years in prison? I believe over 20. So over 20 years, and during that 20 years, I guess about five years ago, King was killed. But it appears, at least in light most favorable, they should have been in prison in the first instance, much less 20 plus years. And also in a light most favorable, they are there because of the detectives having done something. I mean, it can't be that they were in prison for no reason, that the detectives had nothing to do with it, and yet there's a declaration of innocence that they are in prison for this period of time. But had it been 10 years ago, King would have been living, and you could use the statement. But they are there wrongfully in prison, and because they are wrongfully in prison until it finally comes up, they're innocent. They are punished for being in prison because they don't have the benefit of King's testimony, because he's killed in 2020. And it just seems sort of maybe perverse in some ways that individuals who have been, who are declared to be innocent, innocent, declared that, I support that, they didn't have to do that, they let them out, but didn't have to take that next step and say, you're innocent factually. But I'm concerned, and maybe it doesn't have to go to the real issue, but there is something there that differentiates it from other cases where witnesses are not available. And it's as though you can't bring this action because no one has come forth with any evidence, the evidence or the reasons you've been here hasn't come forth to now finally, for want of another term, you probably don't like it, vindicate them, so to speak. But you do agree they should not have been in prison based upon what the state determined? No, Your Honor, I don't. You think they should have spent 20 years, even though the state says they were not, they were innocent? Yes, we were not a party to the state's proceedings. Basically, the judge in those, and it's called a writ of actual innocence, that's just what the procedure for letting people out is called. But the question of you're not a party to putting them there either. The state put them there. The state said they were guilty. The state did that. You don't get to, it's not a question whether you think they're actually innocent. You don't really matter on that. It's a question of does the state that put them there say they are actually innocent? That's a term of art that's come out now quite a bit. It's a differentiation from clemency, pardon, or forgiveness on any level. But when you get to actual innocence, that's a factual determination. Is it not? No, Your Honor, not in this case. In this case, Your Honor, the state's attorney. But I want to know what is the determination of actual innocence in the state? You're telling me that does not mean the state said you are factually innocent. You're saying that? No, Your Honor, it does not mean that under Maryland law. And where is that stated? I don't have the statute before me, but what is that? You're saying the statute says it does not mean that you are actually innocent. No, what is required in the statute is that there's supposed to be new evidence. The judge found that there was not new evidence, but because the state was asking for them to be let out anyway, they said, okay, nobody's contesting it, so we're going to let it go. What the statute, I believe, requires is that there be some kind of evidence leaning towards or suggesting actual evidence. It's not that there's not a contested here. There often is not a contested disputation that is resolved by a judge that, yes, these people are actually innocent. They're simply meeting a standard that there's some evidence that might suggest actual innocence. That is, I believe, all that the statute requires. It certainly does not require an actual determination of innocence. Even if it did, this is a separate civil proceeding where the state is not a party. The state is not being sued here. These two detectives cannot be held in some kind of res judicata or estoppel posture. This is simply a brand new situation where the plaintiffs have to prove all their facts. I have to produce evidence that actually shows their facts, and that's what they did not do here. Getting to the hearsay question, because you seem to suggest that this is a brand new case, but it's obviously deeply interlinked with the criminal proceeding. As I understand your formulation of the hearsay rule or what was applied, it seems I can't imagine a circumstance in which testimony in a criminal trial could ever be admissible at a later civil trial, because under your formulation the motive is always different. Is that not? No, Your Honor. Sometimes it meshes up, sometimes it does not. That's, I believe, what the district court held, and she gave an explanation as to why in this case there did seem to be a significant dissimilarity in motive. I think the really important issue, the threshold you're going at, is this a fair substitute? Is the type of cross-examination that happened or that there was a motive to happen, is it a fair substitute for what a defense counsel would be able to do or would be motivated to do? The proof in the government is higher in the criminal context, and so it seems there would be a strong motive in the criminal context, and there's no requirement of privity in terms of the predecessor in interest. There doesn't need to be any privity. So wouldn't it be enough then? No. The motive, wouldn't it be similar enough? Not here, Your Honor, because of what they're trying to use this testimony to do, which is when you look at what they're actually asking the court to do is to look at this testimony to try to create an inference that the 17-page recorded statement was fed to them, that it was fabricated, that all these details, that 17 pages worth of details were actually fed to Mr. King rather than him. Well, I think that would be the jury question. The jury question would be, did that happen? But I think what it's being asked for here is simply to let that in. Yes, Your Honor. They're trying to get an inference of that from a statement, from the trial statement, which actually explicitly said that did not happen. When he was asked, when he said, yeah, there may be some changes. So then why wouldn't you want it to come in? If he explicitly said that in the trial statement, why wouldn't you want to bring that evidence forward? Well, once it comes forward, then there becomes more issues. It's still, we argue and believe it's correct that even if it is in, we still prevail. And you may yet prevail if it goes to trial. But the question is whether it comes in or not, and the question on whether it comes in is whether there was a motive sufficiently similar motive at trial. And to try to explain, to answer your question exactly, Your Honor, the actual testimony at trial said when Mr. King was expressly asked, okay, who told you, did the police officer tell you all these details? No, they didn't say all these details. Who told you what to say on the tape? And the answer was nobody told me. I pressed a little bit. There was some, okay, a whitey I got the information from, but not from the police officers. There was never anything that said the police officers gave me this information. It was just they told me to keep telling the truth. They kept on disbelieving my assertions of innocence. There's nothing that they actually fed any details. So what they're trying to say is that even though there's a direct statement that it wasn't that they didn't feed them details, that there can be an inference from this that somehow all these details came from the police officers, and that's exactly what a civil defense attorney right now would want to go into and make sure that 17 pages of all these details, how many guns did they tell you, how many guns you got, did they tell you who took the guns, did they tell you what color the bag was, did they tell you all these different things that he said, all this information that I did, did they tell you each one of those things? If we had Mr. King available for testimony, we could cross-examine him to that and absolutely dispel any notion that there's a possibility of an inference of these things from his testimony, but we can't do that because he is not available, and the prosecutor had absolutely no motive to do that because the idea that someone would say, yes, even though this testimony explicitly disclaims them feeding you these facts, there's an inference of it, that's not something that was even conceivable at the trial. That's not something that was in the prosecutor's mind at all. In fact, if the prosecutor were to go through all the details in front of the jury to get all that information out, that would actually be harmful or could possibly be harmful to the idea of trying to advance this as a corroboration of Bailey's testimony because some of the details that were allegedly fed by the officers actually contradict some of the things Bailey said, I think like the number of guns, things like that. Mr. Redmond, sorry to interrupt you. I asked Ms. Horn when she got up about the standard of review and the difficult burden that she has, and that's to your advantage, and she responded, I think quite ably, by suggesting at least three factual errors that she thought the district court made that were clearly erroneous. Do you remember that? Yes. Can you explain to me why, if you can, why she's wrong about that? Yes, because she is largely misrepresenting the record. Well, better to say maybe misstate. Sorry, I disagree with what the record actually contains. If she did, and I'm not suggesting that she did. So tell me what she got wrong. Okay, first of all, the idea that the prosecutor wasn't surprised, the distinction that she made, the actual pages that she cites says, yes, she was surprised. Walking in that morning, she had talked to him. You know, frankly, I think any prosecutor would be surprised that the very first witness that she calls recants on the stand. But Ms. Horn says, well, she shouldn't have been surprised because he was doing it left and right at every turn. Well, she was, and yes. Why was she? Go ahead. In her opening statement, she said, Marcus King is going to tell you exactly that he went to go get the bags, the guns. That was in her opening statement. That was going to happen. Likewise, the other, I'm trying to recall exactly what the other points that she made. Well, I think she said she had, the prosecutor had no motive because her principal motive, well, that the motives weren't necessarily exclusive. There were more than one. She had every motive to try to rehabilitate these officers, and in closing, she made the arguments that in fact suggested that her motive was equally to rehabilitate the officers. Yes, and the closing, of course, is actually largely irrelevant because it's not actually the cross-examination. It's taking whatever it is she got during the trial and trying to put the best picture on it. The question is more, what were the questions actually asked during cross-examination? What were the motives that she had, the motive and opportunity that she had at the time in the heat of the moment? And I think by discussion of all the details that a civil defense lawyer trying to dispel this notion of an inference, contrary to what was actually said, all those things are the things that the prosecutor clearly did not have a motive to try to dispel. What more would the prosecutor have asked if there was a similar motive? What would she have asked in addition to what was done at trial? Okay, so did they say that you needed to say that four people were involved? Did they say which four? Did they tell you to say you went to Alfred's house at the specific address you mentioned? Did they tell you to say that you found the guns in Alfred's bedroom closet? That you have saw four but only brought two, the types that you mentioned. Did they tell you to say that appellants already had guns but others took them? These are questions you're saying she should have asked? Yes. And you're prosecuting a case and you're going down the line of everything and get this witness to say every one of those things they told me? Think about what I'm saying. Is that really in the best interest for them to do that? Or to simply have him to say, well, they put words in my mouth and they said it in a general way. It would seem to me from the officer's perspective and the prosecutor's perspective, you do not want it to be specific information. That's what a defense counsel is going to do. Get up and do what you just said because you don't want this witness to gain credibility by keep asking these questions. The more you ask and the deeper you get into it, how does that help? Because you think he's going to say no? That's what he said to the general question. Did they tell you to say what was put on the tape? He said no. Yes, I think that he would say, no, they didn't tell me this specific thing. They didn't tell me that specific thing because he said generally they didn't. But, of course, it's not in the interest of the prosecutor to go about all these things. Keep in mind we're talking about a young man, a young fellow who has clear intellectual disabilities. I know his mother has testified, but she, too, had a drug problem. She left out, said she couldn't stay in that room because she couldn't take it, what was going on. He's shackled at the table there with these officers. No one's in there, and you've got a great gap in terms of this interview that's going on here. And he's saying they put words. He tells me they put words. And the recantation, when it started, he didn't change that now. Apparently he did it early on, and he was consistent with that recantation, as I understand, until he passed away in 2000 or whatever. Or is there any indication there's some difference that went from his testimony from that point? There actually is record in the case that, yes, he did actually incriminate Mr. McPherson on page 11880 in an incarcerated statement. One of his institutional evaluations listed that he actually did this. And that's an oath? That was an oath? No, it's not an oath, Your Honor. But he's an oath. I mean, he's right there on the stand, and you've got a prosecutor going at him. And what he said on the stand. But hear me out. You've got a prosecutor going at him, full strength on him. And you want that prosecutor to pick every one of those statements or go down a statement and say, did he do this? Did he do this? He doesn't need to have done all of them now. It could have been, did you really need to do that? If he says, they put some words in my mouth, I didn't say that. Do you really want to go down and pick out every little thing from a prosecutor's perspective? Or do you want to say, well, that's not true, this is true? You can argue he didn't say that. Exactly. From a prosecutor's perspective, absolutely, that is the problem. I'm not sure the detectives would have done it any different. If they were trying to say that their statement was true, they're not going to go and get him to go back and forth on each one of those. For civil defense, absolutely, Your Honor. When he's already said that, yes, they didn't tell me what to say, I'm going to try to avoid any possibility of the inference that they're now trying to argue, when I know that's what they're trying to argue, to dispel it. You would think, if he says, they put words in my mouth, and I didn't say those things, there's something in there he's going to say they told him, right? No, because he explained the way. If you go down every line, eventually you'll come to the conclusion he's not, everything in there is what he said. Yes, exactly. Back in the trial in 1995, I'm talking about the similar motive type thing here. Yes, Your Honor. I'm just not following that. I got it in terms of, now you look at it back then, but when you've got someone with intellectual disabilities who's on a stand, and they make a statement like that, oh, you can attribute all kinds of things if you don't deal with it too specific. But if you deal enough, you can figure out he knows what he's talking about. And the motive of the civil defense attorneys right now is to make sure that you can't attribute all kinds of things. They want to make sure that, pin down exactly what the truth is, to pin down exactly that what he said generally, that they just disbelieved me, they just kept on telling me I was lying, that that is all that they did. There's no trying to attribute all kinds of things if you go down and say, yes, they didn't tell me to say this, they didn't tell me to say that, they didn't tell me to say all these different things. There'd be nothing left for them to try to argue there's an inference contrary to his actual statement, which was that nobody told him what to say. All right, thank you, Mr. Rudman. Thank you. Thanks for the judgment to be affirmed. Next. Ms. Warren. Yes. I want to start where we stopped, which is defense counsel providing very granular questions that the prosecutor should have asked. That's not anywhere in the case law. The case law talks about lines of inquiry that she should have examined. They identified several in their brief. We demonstrated that all of those were covered. And I just want to, I picked out some quotes while he was arguing that addressed this idea of who said, she should have asked who said what, who told you to say what. Here's what she asked. Who was making you say stuff out of your mouth? That's one question. Okay, now you said somebody told you what you had to say. What did they tell you you had to say? Another question. You said the police told you what to do. I want you to tell me exactly who told you what to do and what they told you to do. Another question. What exactly did the white detective tell you you had to say? Yet again, Marcus, when exactly did the police tell you what to say? Another question. Now, did the police give you a script and tell you exactly what they wanted you to say? This issue of who told him what to say, it was covered. And if the requirement under 804B were as granular as the questions they're asking, testimony would never qualify. It would never be able to be admitted under 804B1. Because there's always going to be a question that you could have asked or you should have asked that doesn't get asked. But that doesn't change whether or not there were similar motives. Ms. Horne, can I ask you about that question about whether or not the district court, in your view, thought that there was a per se bar on admission of this kind of testimony in a civil trial? Do you think the district court misunderstood the law? I do think that the district court adopted by saying I find the district court said here's Hill, here's Fields. I find Hill more persuasive. If you look at what's in Hill, Hill is a categorical bar. Hill says prosecutors, they're there to do justice. They don't have the same motives as civil defendants. And the stakes are always different. Obviously a prosecutor is trying to prosecute someone and convict them of a crime. A civil defendant is trying to avoid liability. That is a categorical bar. That is saying that. Might one read that as suggesting that she found the facts in, is it Fields? Is that the first case? More analogous to the facts in this case and therefore the same results should obtain? No, Your Honor. I don't think that that's what she did. Because one of the facts that she found was that it would have been a reasonable trial strategy, for example, for the prosecutor to have just cut her losses, got enough testimony to get the police statement in, and then got Marcus off the stand. That is kind of in the abstract, right? That's sort of an abstract thought that could have been true. But it's not what happened here. That's saying that prosecutors have these, you know, there are these ideas, there's these motives that prosecutors have that can never be replicated by the civil defendants. I don't think she was looking specifically at the facts of Hill or the facts of Fields. Frankly, they're very similar. In one case, in Hill, it was a deceased co-defendant. And in Fields, it was an unavailable witness. You probably weren't even born or much very young in 1995, but is there anything in the record that indicates where those detectives were during that testimony? In the courtroom? Or were they in the courtroom? Is there anything in the record? You probably don't know. But I'm – The only thing I – Sometimes they're actually sitting there next to counsel. Sometimes they turn around and talk. But there's nothing in the record to point to that, I take it. The only thing I can say that's in the record is that when Marcus identifies the detective who told him what to say, he says it's the white detective who was not in the courtroom at that time, I believe, was outside the courtroom. I see. That's the only information that I have to answer that particular question. Ms. Horn, Mr. Redman began his argument with an assertion that your client, in fact, admitted his guilt in an effort to obtain parole. And you don't dispute that, but you characterize it differently. What is the relevance, if anything, about that admission? I don't think there's any relevance at summary judgment about that admission. It was for – he did make a statement. He regrets, obviously, making it to get into the Patuxent Eligible Persons Program. It is not true. And I wanted to – I think the fact that they're so focused on that particular piece of evidence really reflects that the defendant's argument. They still want the evidence to be taken in the light most favorable to them. The fact that it was so difficult – for purposes of summary judgment, these clients are innocent. They're innocent. There is ample evidence of their innocence. They certainly, at a jury trial, can contest that. But for our purposes here on appeal in this procedural posture, they're innocent, and the evidence has to be taken in the light most favorable to them. And I just want to speak to they didn't just get – they didn't just have their writ of actual innocence granted. They actually got a certificate of error from the state of Maryland that indicates they are, in fact, innocent. What does that mean, a certificate of error? So currently there is the Walter Lomax Act that provides a mechanism for which people can prove, I think it's by a preponderance of the evidence, that they're actually innocent of the crime. Before the Walter Lomax Act was granted, the persons in that position would have to get a certificate of error from the state's attorney's office in order to pursue that line. Pursue that avenue of relief, excuse me. One question about that. It sure isn't it that the trial judge who granted the writ expressed some skepticism about it, but essentially, since the parties agreed, signed it? The judge expressed some skepticism that the evidence was new, but if you look at – and Lauren Lipscomb, who was the head of the Conviction Integrity Unit, apologies, did testify in this case. There was an extensive memo that indicated that they found that there was substantial evidence of their innocence that came through both because of the number of alibi witnesses that testified on their behalf, all of whom were corroborated, but also because there were significant questions about Diane Bailey's ability to see what she saw, ability to hear what she alleged she heard, and the reliability of her testimony, which, as Detective Patton admitted at trial, was completely uncorroborated. They couldn't find crime scene evidence to corroborate it. They couldn't find a single witness to corroborate it. In fact, the eyewitnesses said not only that the shooting started in a different location that she admitted she couldn't see, but that there was one shooter not for – and certainly not running, as I mentioned, up and down the street. The last thing – I know I'm probably running short on time. No, you're over your time. Well, if you'll indulge me, which is that, Judge Winn, you said if – I think I'm very much paraphrasing you. You said if this isn't the kind of testimony that can come in, what is? And I think that that is correct. You said, you know, it's not their fault that Mr. King is unavailable, that he's not able to testify. And I would direct this court to its – this court's opinion, Sharon v. Crane-Hoodale International. I might be mispronouncing it, 47F Sut 3D 280. And I think that case really talks about this idea that this is the – it really extends the idea that this testimony is, in fact, more probative of anything else that's available because so many years have passed, 30 years have passed, so it would serve the interest of justice because the alternative is no testimony at all, and that is patently unfair and not in the interest of justice of this case and the vindication that these clients – the interest they have in vindicating their rights. All right. Thank you, Ms. Horne. Thank you so much. I appreciate it. I want to thank both counsel for their arguments this morning. We'll come down and greet you and adjourn court for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Albert Diaz, James Andrew Wynn, Nicole G. Berner